**BROADCAST MUSIC, INC., et al., Plaintiffs–Appellees,**

**v.**

**STAR AMUSEMENTS, INC. and Leland Charles Hescher, Defendants–Appellants.**

**No. 93–4074.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1994.

Decided Jan. 4, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 30, 1995.

Jonathan Zavin (argued), Edward L. Powers, Victor C. Bushell, Richards & O'Neil, New York City, James Balanoff, Balanoff & Balanoff, Munster, IN, for plaintiffs-appellees.

Timothy F. Kelly (argued), Karl K. Vanzo, Munster, IN, for defendants-appellants.

Before CUMMINGS, FLAUM and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

In this copyright infringement suit, a jukebox operator challenges the district court's award of $140,000, the maximum statutory damages. In fixing its award, the district court relied in part on defendants' failure to pay more than $75,000 in copyright registration fees. We affirm.

Background

Under federal law, a copyright holder has the right to control the public performance of his work. Radio stations, bars, nightclubs and jukebox operators all must pay licensing fees to copyright holders for the right to play copyrighted music for the public. Performing rights societies, such as Broadcast Music, Inc. ("BMI") and the American Society of Composers, Authors and Publishers ("ASCAP"), were formed so that operators of such establishments would not have to negotiate individual agreements with every composer whose songs they intended to play. BMI and ASCAP have agreements with thousands of composers to license the public performing rights for their songs. Each organization controls approximately 45% of copyrighted music. BMI negotiates blanket licenses which grant the operator of a bar, radio station, etc., the right to play any of the thousands of songs in its stable for a fixed fee. BMI distributes 80% of the money received for such licenses back to the composers based on the popularity of their songs.

Prior to 1990, the period relevant for this action, BMI and ASCAP did not negotiate licenses directly with jukebox operators. Instead, operators of jukeboxes which played copyrighted music in public were required to register their jukeboxes with the United States Copyright Office and pay an annual registration fee.[1] 17 U.S.C. § 116. Operators of registered jukeboxes received registration certificates and were required to attach these certificates to the jukeboxes in a location readily visible to the public. 17 U.S.C. § 116(b)(1)(C). The Copyright Office distributed the registration fees to BMI and other performing rights societies which would then funnel them to the copyright holders of the music. An act of copyright infringement occurred every time an unregistered jukebox played a copyrighted song in public. Infringing operators were subject to various Copyright Act remedies including

1. Alternatively operators could obtain specific permission from the copyright owners. There is no suggestion that defendant took this unlikely course.

statutory damages from $250 to $10,000 per song (up to $50,000 per song if the infringement was found to be willful). 17 U.S.C. § 504(c).

In order to enforce the law, BMI hired people to check for certificates on jukeboxes. Finding a box lacking a certificate, BMI inspectors would wait for several hours and record the names of the songs played, each being a potential infringement.

Defendant Leland Charles Hescher was the president, majority shareholder and "dominant influence" in defendant Star Amusement (Pl.Supp.App. 38). Star Amusement operated between 203 and 263 jukeboxes each year between 1984 and 1990. Of these 200–plus jukeboxes, only a small fraction were registered during this period.[2] By failing to register all of its jukeboxes during this period, Star Amusement avoided paying the Copyright Office over $75,000 in fees. In 1987 Star Amusement had gross revenues of over $1.5 million.

BMI brought suit against Star Amusement and Hescher on March 14, 1990. BMI alleged 29 infringements at 3 different bars in Indiana at which Star Amusement operated allegedly unregistered jukeboxes. The alleged infringements were documented by BMI field inspectors who visited the three locations on September 23, 1987, December 15, 1988 and June 12, 1989. In the pretrial order, the parties stipulated to many of the facts and to the number of musical performances alleged in the complaint, i.e., the number of songs the field inspectors sat through at each bar. After a two-day trial on the issue of liability, the jury returned a verdict of non-willful infringement at one of the three locations and no infringement at the other two.

Following the trial, the parties agreed to have the district court assess damages. The district court awarded BMI the maximum statutory damages for non-willful infringement, totaling $140,000—$10,000 for each of the 14 infringing performances. Defendants appeal this award.

Discussion

Defendants' basic contention is that the trial court abused its discretion in choosing the maximum rather than the minimum from the range of allowed statutory damages. We note at the outset that the standard for reviewing an award of statutory damages within the allowed range is even more deferential than abuse of discretion:

> [T]he employment of the statutory yardstick, within set limits, is committed solely to the court which hears the case, and this fact takes the matter out of the ordinary rule with respect to abuse of discretion.

*Douglas v. Cunningham,* 294 U.S. 207, 210, 55 S.Ct. 365, 366, 79 L.Ed. 862. Defendants nonetheless persist.

Defendants first claim that the trial judge disregarded the jury's finding of non-willfulness. They base this claim on the judge's statement in his order that: "While the jury's finding on willfulness has some support in the record and is not irrational, the court would have decided the issue differently (Def.App. 5)." Despite his differing conclusion, the trial court clearly did not disregard the jury's determination when he limited the statutory damages per infringement to $10,000 rather than the $50,000 available for willful infringement.

Defendants argue that in choosing the maximum non-willful award the judge was improperly influenced by his own conclusion on willfulness. To support this argument and the proposition that the trial court has the "burden" to justify anything beyond minimum statutory damages, defendants rely solely on this Court's opinion in *Video Views, Inc. v. Studio 21, Ltd.,* 925 F.2d 1010 (7th Cir.1991). Defendants' reliance is misplaced.

The issue in *Video Views* was whether a defendant had a right to a jury trial when the plaintiff was seeking statutory damages. We held that the defendant did have a right to jury trial on the issues of infringement and willfulness but that "it is for the district court and not for a jury to determine the appropriate award of statutory damages, within the limits prescribed in §§ 504(c)(1) and (2), respectively." *Id.* at 1014. This Court went on to state:

2. For the years in question the fraction of registered jukeboxes of the total operated were: 1984–0/203, 1985–0/213, 1986–19/227, 1987–20/245, 1988–50/260, 1989–50/263, 1990–188/251.

> The district court is accorded wide and almost exclusive discretion in determining the size of the statutory damage award. However, concerns of due process and the opportunity for meaningful, if limited, appellate review contemplate that the district court would provide *some* explanation of the factual findings that underlie this exercise of discretion to award greater than minimum statutory damages.

*Id.* at 1017 (emphasis in original) (citation omitted). As we will see, the district court provided more than ample explanation.

■ Defendants next challenge the trial court's justification of the award based on the amount of Star Amusement's unpaid licensing fees. Following *Broadcast Music, Inc. v. Triple L Vending, Inc.*, 1987 Copyright Law Decisions (CCH) ¶ 26,174 at p. 21,366, 1987 WL 45244 (W.D.Tex.1987), and *International Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 383 (7th Cir.1988), the court concluded that three times unpaid fees was an appropriate award to ensure that violation of the copyright laws is a more expensive option than compliance. The court concluded that the statutory maximum of $140,000, less than twice unpaid fees, was therefore reasonable and not excessive.

Defendants claim that this method of assessing damages is inappropriate because it is based on speculation about unproven infringements, citing *Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233 (5th Cir.1988). Defendants are wrong on both counts. The district court did not rely on speculation about unproven infringements and *Xanthas* does not hold that the trial court's method was inappropriate. In *Xanthas* the district court found that defendant had committed 182 infringements at 22 locations. The district court awarded statutory damages of $1750 per infringement for a total of $319,500 chosen to equal approximately three times the unpaid fees on all of defendant's unregistered jukeboxes for the prior four years. The Fifth Circuit reversed in part because the trial court had determined ownership of 15 of the infringing jukeboxes based on inadmissible hearsay, leaving 44 infringements at seven locations intact. The Fifth Circuit remanded for a new determination of damages even though the $319,000 award was within the statutory range for 44 infringements. The court characterized as "difficult" but did not reach the issue of the district court's basing its award on all of defendant's unpaid registration fees for years in which plaintiff neither alleged nor proved infringement. *Xanthas*, 855 F.2d at 240. On remand the district court applied the same methodology and awarded $308,000, $7000 for each of the 44 remaining infringements (Pl.Br. 23).

All *Xanthas* stands for is the proposition that when making a statutory award, the district court must know how many infringements have been proven. It does not limit what the district court can consider in making an award within the statutory range for the number of proven infringements. Basing the award on some multiple of the unpaid fees is not only not improper, it is eminently reasonable. See *Video Views*, 925 F.2d at 1015 (district court may consider circumstances of the infringement and the efficacy of the damages as a deterrent to future copyright infringement).

In a sense, unpaid registration fees actually provide a superior yardstick than total infringements for measuring appropriate damages. When the infringer is a jukebox operator, the transgression really occurs when the operator places an unregistered jukebox into operation in a public establishment. The number of technical infringements that result depends on the number of coins that are fed into the box. Though this number may in some abstract sense be a measure of the harm done to the copyright holders, it has little relation to their actual monetary harm which occurs when they do not receive their shares of the unpaid registration fee. This number has even less to do with the jukebox operator's culpability, which is better measured by the number of unregistered jukeboxes he has placed in operation. Because jukeboxes do not keep a count of songs played, the number of provable infringements, which depends on how long BMI is willing to pay someone to sit in a bar and listen to other people play the jukebox, bears even less relation to either the culpability of the operator or the harm done to the copyright holders.

Defendants claim that such reliance on unpaid registration fees involves improper speculation by the district court. In the present case, defendants stipulated in a pretrial order to the number of jukeboxes oper-

ated during the years in question.[3] The number of unregistered jukeboxes for each year was therefore known with certainty. The only "speculation" required of the district court in reaching the conclusion that each represented a violation of the copyright laws was to infer that at some point during the year someone put a coin in each and played a copyrighted song. Given the stipulated fact that in 1987 defendants' 245 jukeboxes generated over $1.5 million, it is a reasonable inference that each received at least one coin.

Defendants next contend that the district court did not adequately consider the amount Hescher was benefitted and BMI harmed by the specific instances of proven infringements, i.e., the playing of 14 songs on a single jukebox. For the reasons discussed above, we reject this argument. In assessing the harms and ill-gotten benefits, the district court properly considered defendants' practice of registering only a token number of their over 200 jukeboxes.

Finally, Hescher's claimed reliance on alleged advice (from a now deceased) ASCAP representative that he need only register jukeboxes in "highly visible" locations was properly dismissed by the district court as more indicative of an attempt to break the law without getting caught than the claimed good-faith attempt to comply.

Conclusion

The district court had almost unfettered discretion in setting its statutory damage award within the prescribed range. In assessing the maximum award of $140,000, the court properly considered a multiple of defendants' unpaid jukebox registration fees as an appropriate measure for purposes of deterrence and compensation. We affirm.

3. Defendants now claim that "operated" did not mean operated but owned and that many of the jukeboxes were used for spare parts or were otherwise out of service. The district court correctly dismissed this attempt by defendants to evade the results of their stipulation. Moreover, in 1990 when defendants apparently began to take the law seriously, they registered 188 of 251 jukeboxes indicating that at least that percentage was normally in service.